## BLUEFIELD WATER WORKS & IMPROVEMENT COMPANY v. PUBLIC SERVICE COMMISSION OF THE STATE OF WEST VIRGINIA ET AL.

ERROR TO THE SUPREME COURT OF APPEALS OF THE STATE OF WEST VIRGINIA.

No. 256. Argued January 22, 1923.—Decided June 11, 1923.

1. A judgment of the highest court of a State which upholds an order of a state commission fixing the rates of a public utility company over the objection that the rates are confiscatory and the order hence violative of the Fourteenth Amendment, is reviewable here, on the constitutional question, by writ of error. P. 683.

2. In estimating the value of the property of a public utility corporation, as a basis for rate regulation, evidence of present reproduction costs, less depreciation, must be given consideration. P. 689. *Southwestern Bell Telephone Co.* v. *Public Service Commission, ante,* 276.

3. A public utility corporation, challenging as confiscatory rates imposed by a state commission, is entitled, under the due process clause of the Fourteenth Amendment, to the independent judgment of the court as to both law and facts. *Id.*

4. Rates which are not sufficient to yield a reasonable return on the value of the property used, at the time it is being used to render the service of the utility to the public, are unjust, unreasonable and confiscatory; and their enforcement deprives the public utility company of its property, in violation of the Fourteenth Amendment. P. 690.

5. A public utility is entitled to such rates as will permit it to earn a return on the value of the property it employs for the convenience of the public equal to that generally being made at the same time, and in the same region of the country, on investments

in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. P. 692.

6. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain its credit, and enable it to raise the money necessary for the proper discharge of its public duties. *Id.*

7. A rate of return may be reasonable at one time, and become too high or too low by changes affecting opportunities for investment, the money market, and business conditions generally. *Id.*

8. In this case, 6% was inadequate to constitute just compensation. P. 695.

89 W. Va. 736, reversed.

ERROR to a judgment of the Supreme Court of Appeals of West Virginia, sustaining an order of a state commission fixing water rates, in a suit brought by the plaintiff in error to set the order aside.

*Mr. Alfred G. Fox*, with whom *Mr. Joseph M. Sanders* was on the briefs, for plaintiff in error.

*Mr. Russell S. Ritz* for defendants in error.

The judgment of the Supreme Court of Appeals of West Virginia herein does not declare valid any statute of the State or any authority exercised under the State, which is repugnant to the Constitution, treaties, or laws of the United States.

The most that can be claimed is that the Commission, acting under lawful authority in reaching the conclusion from a disputed state of facts, found and fixed the value of plaintiff's property for rate making purposes at an amount less than some other tribunal may have fixed and determined from a like state of facts. A judgment based upon such a state of facts does not raise such a federal question as gives a right of review from this Court to the highest court of the State by a writ of error.

The Public Service Commission and the Supreme Court of Appeals acted under valid state authority. The authority or law under which these respective tribunals exercised jurisdiction not being repugnant to any federal law, what conclusions they may have reached from a given state of facts which furnishes the basis for the judgment complained of herein, does not present a question subject to be reviewed by writ of error. Such questions can be reviewed only on petition for a writ of certiorari. *Zucht* v. *King,* 260 U. S. 174; *Stadelman* v. *Miner,* 246 U. S. 544; *Philadelphia & Reading Coal Co.* v. *Gilbert,* 245 U. S. 162; *Ireland* v. *Woods,* 246 U. S. 323.

It is not here contended that a public utility is not entitled to a fair return upon the fair and reasonable value of all of its plant and property then used and useful in the public service, but we submit that the fair and reasonable value of a public utility's plant and property is not to be ascertained by adopting only one method of valuation to the exclusion of all other known methods and elements of value. A valuation of a public utility, such as would be fair to the public as well as the utility, should take into consideration the original cost or investment in the utility; the market value of its stocks or bonds, if any; the probable earning capacity of the property; the various rates it has received and the rate it is receiving; the amounts necessary to meet operating expenses; the ability of the utility to adequately perform the public service; the history of the operations of the utility; and perhaps other elements; and after taking all of these into consideration, fix a value that will be fair both to the public and to the utility. *Smyth* v. *Ames,* 169 U. S. 466; *San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 439; *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739; *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1; *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153; *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19.

If by taking one element or method of value a conclusion is reached which is out of all proportion with a conclusion that may be reached by taking other methods, then that measure or method should be adopted which will, after taking into consideration all of the elements of value, make a fair and reasonable value on the utility's property, used and useful in the public service.

The reproduction theory of public utility valuation has been usually resorted to by the public to safeguard itself against values of public utilities, based upon inflated and watered stock investments, purporting to represent original cost. Practically all, if not all, of the decisions of this Court, in which this theory of valuation was even considered, were cases of this character; and even in them this Court has never held that the reproduction new theory at present prices was an exclusive method by which public utility values are to be determined. *Smyth* v. *Ames, supra;* Whitten, Valuation Public Service Corporations, c. V, p. 82, et seq.; 2 Wyman, Public Service Corporations, c. 32; *Coal & Coke Ry. Co.* v. *Conley,* 67 W. Va. 129; *Minnesota Rate Cases,* 230 U. S. 352.

If determining public utility values for rate-making purposes is to be accomplished by using the reproduction new theory at present prices, to the exclusion of every other element and method of values, then it may well be seen to what uncertain, as well as unfair, consequences it may lead. If the market is abnormally low and a valuation on this theory is made at such a time, without taking into consideration past costs or other elements of value, it would be manifestly unfair to the utility. Likewise, if this theory of valuation is used at a time of abnormally high prices in the market, such as was produced by the World War, and all other methods and elements of values are excluded, then it would be most unfair to the public, who would be expected to pay rates

of return upon such unfair value so reached. *Potomac Electric Power Co.* v. *Public Utilities Comm.,* 276 Fed. 330; *New York Pub. Serv. Comm.* No. 5, P. U. R. 93C; *Newton* v. *Consolidated Gas Co.,* 258 U. S. 165.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Plaintiff in error is a corporation furnishing water to the city of Bluefield, West Virginia, and its inhabitants. September 27, 1920, the Public Service Commission of the State being authorized by statute to fix just and reasonable rates, made its order prescribing rates. In accordance with the laws of the State (§ 16, c. 15-0, Code of West Virginia) the company instituted proceedings in the Supreme Court of Appeals to suspend and set aside the order. The petition alleges that the order is repugnant to the Fourteenth Amendment, and deprives the company of its property without just compensation and without due process of law and denies it equal protection of the laws. A final judgment was entered denying the company relief and dismissing its petition. The case is here on writ of error.

1. The city moves to dismiss the writ of error for the reason, as it asserts, that there was not drawn in question the validity of a statute or an authority exercised under the State, on the ground of repugnancy to the Federal Constitution.

The validity of the order prescribing the rates was directly challenged on constitutional grounds, and it was held valid by the highest court of the State. The prescribing of rates is a legislative act. The commission is an instrumentality of the State, exercising delegated powers. Its order is of the same force as would be a like enactment by the legislature. If, as alleged, the prescribed rates are confiscatory, the order is void. Plaintiff in error is entitled to bring the case here on writ of error and to have that question decided by this Court. The motion to dismiss will be denied. See *Oklahoma Natural Gas Co.* v.

*Russell,* 261 U. S. 290, and cases cited; also *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287.

2. The commission fixed $460,000 as the amount on which the company is entitled to a return. It found that under existing rates, assuming some increase of business, gross earnings for 1921 would be $80,000 and operating expenses $53,000, leaving $27,000, the equivalent of 5.87 per cent., or 3.87 per cent. after deducting 2 per cent. allowed for depreciation. It held existing rates insufficient to the extent of $10,000. Its order allowed the company to add 16 per cent. to all bills, excepting those for public and private fire protection. The total of the bills so to be increased amounted to $64,000. That is, 80 per cent. of the revenue was authorized to be increased 16 per cent., equal to an increase of 12.8 per cent. on the total,—amounting to $10,240.

*As to value.* The company claims that the value of the property is greatly in excess of $460,000. Reference to the evidence is necessary. There was submitted to the commission evidence of value which it summarized substantially as follows:

a. Estimate by company's engineer on basis of reproduction new, less depreciation, at prewar prices.......    $624, 548. 00
b. Estimate by company's engineer on basis of reproduction new, less depreciation, at 1920 prices..........  $1, 194, 663. 00
c. Testimony of company's engineer fixing present fair value for rate making purposes.....................    $900, 000. 00
d. Estimate by commission's engineer on basis of reproduction new, less depreciation at 1915 prices, plus additions since December 31, 1915, at actual cost, excluding Bluefield Valley Water Works, water rights and going value ......................    $397, 964. 38

e. Report of commission's statistician
   showing investment cost less depre-
   ciation ........................    $365, 445. 13
f. Commission's valuation, as fixed in
   Case No. 368 ($360,000) plus gross
   additions to capital since made
   ($92,520.53) ...................    $452, 520. 53

It was shown that the prices prevailing in 1920 were nearly double those in 1915 and prewar time. The company did not claim value as high as its estimate of cost of construction in 1920. Its valuation engineer testified that in his opinion the value of the property was $900,-000,—a figure between the cost of construction in 1920, less depreciation, and the cost of construction in 1915 and before the war, less depreciation.

The commission's application of the evidence may be stated briefly as follows:

*As to "a", supra.* The commission deducted $204,000 from the estimate (details printed in the margin),[1] leaving approximately $421,000 which it contrasted with the estimate of its own engineer, $397,964.38 (see *"d", supra*). It found that there should be included $25,000 for the Bluefield Valley Water Works plant in Virginia, 10 per cent. for going value, and $10,000 for working capital. If these be added to $421,000 there results $500,600. This may be compared with the commission's final figure, $460,000.

---

[1] Difference in depreciation allowed.....................    $49, 000
Preliminary organization and development cost..........    14, 500
Bluefield Valley Water Works Plant.....................    25, 000
Water rights ..........................................    50, 000
Excess overhead costs .................................    39, 000
Paving over mains......................................    28, 500

                                    [*sic*] $204, 000

*As to "b" and "c", supra.* These were given no weight by the commission in arriving at its final figure, $460,000. It said:

" Applicant's plant was originally constructed more than twenty years ago, and has been added to from time to time as the progress and development of the community required. For this reason, it would be unfair to its consumers to use as a basis for present fair value the abnormal prices prevailing during the recent war period, but when, as in this case, a part of the plant has been constructed or added to during that period, in fairness to the ·applicant, consideration must be given to the cost of such expenditures made to meet the demands of the public."

*As to "d", supra.* The commission taking $400,000 (round figures) added $25,000 for Bluefield Valley Water Works plant in Virginia, 10 per cent. for going value, and $10,000 for working capital, making $477,500. This may be compared with its final figure, $460,000.

*As to "e", supra.* The commission on the report of its statistician found gross investment to be $500,402.53. Its engineer applying the straight line method found 19 per cent. depreciation. It applied 81 per cent. to gross investment and added 10 per cent. for going value and $10,000 for working capital, producing $455,500.[2] This may be compared with its final figure, $460,000.

*As to "f", supra.* It is necessary briefly to explain how this figure, $452,520.53, was arrived at. Case No. 368 was a proceeding initiated by the application of the company for higher rates, April 24, 1915. The commission made a valuation as of January 1, 1915. There were presented two estimates of reproduction cost less depreciation, one by a valuation engineer engaged by the com-

---

[2] As to "e". $365,445.13 represents investment cost less depreciation. The gross investment was found to be $500,402.53, indicating a deduction on account of depreciation of $134,957.40, about 27 per cent. as against 19 per cent. found by the commission's engineer.

pany and the other by a valuation engineer engaged by
the city, both " using the same method." An inventory
made by the company's engineer was accepted as cor-
rect by the city and by the commission. The method
" was that generally employed by courts and commis-
sions in arriving at the value of public utility properties
under this method", and in both estimates " five year
average unit prices " were applied. The estimate of the
company's engineer was $540,000 and of the city's engi-
neer, $392,000. The principal differences as given by the
commission are shown in the margin.[3] The commission
disregarded both estimates and arrived at $360,000. It
held that the best basis of valuation was the net invest-
ment, i. e., the total cost of the property less deprecia-
tion. It said: " The books of the company show a total
gross investment since its organization, of $407,882.00,
and that there has been charged off for depreciation from
year to year the total sum of $83,445.00, leaving a net
investment of $324,427.00. . . . From an examina-
tion of the books . . . it appears that the records of
the company have been remarkably well kept and pre-
served. It, therefore, seems that when a plant is de-
veloped under these conditions the net investment which
of course means the total gross investment less deprecia-
tion is the very best basis of valuation for rate making pur-
poses and that the other methods above referred to should

|                                      | Company engineer. | City engineer. |
|--------------------------------------|-------------------|----------------|
| [3] 1. Preliminary cost .............. | $14,455           | $1,000         |
| 2. Water rights ...................  | 50,000            | Nothing.       |
| 3. Cutting pavements over mains.... | 27,744            | 233            |
| 4. Pipe lines from gravity springs.... | 22,072         | 15,442         |
| 5. Laying cast iron street mains..... | 19,252          | 15,212         |
| 6. Reproducing Ada Springs........ | 18,558            | 13,027         |
| 7. Superintendence and Engineering.. | 20,515          | 13,621         |
| 8. General contingent cost .......... | 16,415          | 5,448          |
|                                      | $189,011          | $63,983        |

be used only when it is impossible to arrive at the true investment. Therefore, after making due allowance for capital necessary for the conduct of the business and considering the plant as a going concern, it is the opinion of the commission that the fair value for the purpose of determining reasonable and just rates in this case of the property of the applicant company, used by it in the public service of supplying water to the City of Bluefield and its citizens, is the sum of $360,000.00, which sum is hereby fixed and determined by the Commission to be the fair present value for the said purpose of determining the reasonable and just rates in this case."

In its report in No. 368, the commission did not indicate the amounts respectively allowed for going value or working capital. If 10 per cent. be added for the former, and $10,000 for the latter (as fixed by the commission in the present case) there is produced $366,870, to be compared with $360,000, found by the commission in its valuation as of January 1, 1915. To this it added $92,520.53 expended since, producing $452,520.53. This may be compared with its final figure, $460,000.

The State Supreme Court of Appeals holds that the valuing of the property of a public utility corporation and prescribing rates are purely legislative acts not subject to judicial review except in so far as may be necessary to determine whether such rates are void on constitutional or other grounds; and that findings of fact by the commission based on evidence to support them will not be reviewed by the court. *Bluefield* v. *Water Works Co.*, 81 W. Va. 201, 204; *Coal and Coke Co.* v. *Public Service Commission*, 84 W. Va. 662, 678; *Charleston* v. *Public Service Commission*, 86 W. Va. 536.

In this case (89 W. Va. 736) it said (p. 738):

"From the written opinion of the commission we find that it ascertained the value of the petitioner's property for rate making [then quoting the commission] ' after

maturely and carefully considering the various methods presented for the ascertainment of fair value and giving such weight as seems proper to every element involved and all the facts and circumstances disclosed by the record.'"

The record clearly shows that the commission in arriving at its final figure did not accord proper, if any, weight to the greatly enhanced costs of construction in 1920 over those prevailing about 1915 and before the war, as established by uncontradicted evidence; and the company's detailed estimated cost of reproduction new, less depreciation, at 1920 prices, appears to have been wholly disregarded. This was erroneous. *Missouri ex rel. Southwestern Bell Telephone Co.* v. *Public Service Commission, ante,* 276. Plaintiff in error is entitled under the due process clause of the Fourteenth Amendment to the independent judgment of the court as to both law and facts. *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287, 289, and cases cited.

We quote further from the court's opinion (pp. 739, 740):

"In our opinion the commission was justified by the law and by the facts in finding as a basis for rate making the sum of $460,000.00 . . . In our case of *Coal & Coke Ry. Co.* v. *Conley,* 67 W. Va. 129, it is said: 'It seems to be generally held that, in the absence of peculiar and extraordinary conditions, such as a more costly plant than the public service of the community requires, or the erection of a plant at an actual, though extravagant, cost, or the purchase of one at an exorbitant or inflated price, the actual amount of money invested is to be taken as the basis, and upon this a return must be allowed equivalent to that which is ordinarily received in the locality in which the business is done, upon capital invested in similar enterprises. In addition to this, consideration must be given to the nature of the investment, a higher rate

being regarded as justified by the risk incident to a hazardous investment.'

" That the original cost considered in connection with the history and growth of the utility and the value of the services rendered constitute the principal elements to be considered in connection with rate making, seems to be supported by nearly all the authorities."

The question in the case is whether the rates prescribed in the commission's order are confiscatory and therefore beyond legislative power. Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment. This is so well settled by numerous decisions of this Court that citation of the cases is scarcely necessary. " What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience." *Smyth* v. *Ames,* (1898) 169 U. S. 466, 547.

" There must be a fair return upon the reasonable value of the property at the time it is being used for the public. . . .

"And we concur with the court below in holding that the value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase." *Willcox* v. *Consolidated Gas Co.,* (1909) 212 U. S. 19, 41, 52.

" The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." *Minnesota Rate Cases,* (1913) 230 U. S. 352, 434.

"And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property." *Smyth* v. *Ames, supra,* 546, 547.

" . . . . The making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law." *Minnesota Rate Cases, supra,* 454.

In *Missouri ex rel. Southwestern Bell Telephone Co.* v. *Public Service Commission, supra,* applying the principles of the cases above cited and others, this Court said:

" Obviously, the Commission undertook to value the property without according any weight to the greatly enhanced costs of material, labor, supplies, etc., over those prevailing in 1913, 1914 and 1916. As matter of common knowledge, these increases were large. Competent witnesses estimated them as 45 to 50 per centum . . . It is impossible to ascertain what will amount to a fair return upon properties devoted to public service without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made. An honest and intelligent forecast of probable future values made upon a view of all the relevant circumstances, is essential. If the highly important element of present costs is wholly disregarded such a forecast becomes impossible. Estimates for to-morrow cannot ignore prices of today."

It is clear that the court also failed to give proper consideration to the higher cost of construction in 1920 over that in 1915 and before the war, and failed to give weight to cost of reproduction less depreciation on the basis of 1920 prices, or to the testimony of the company's valuation engineer, based on present and past costs of construction, that the property in his opinion, was worth $900,000. The final figure, $460,000, was arrived at substantially on the basis of actual cost less depreciation plus ten per cent. for going value and $10,000 for working capital. This resulted in a valuation considerably and materially less than would have been reached by a fair and just consideration of all the facts. The valuation cannot be sustained. Other objections to the valuation need not be considered.

3. *Rate of return.* The state commission found that the company's net annual income should be approximately $37,000, in order to enable it to earn 8 per cent. for return and depreciation upon the value of its property as fixed by it. Deducting 2 per cent. for depreciation, there remains 6 per cent. on $460,000, amounting to $27,600 for return. This was approved by the state court.

The company contends that the rate of return is too low and confiscatory. What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in

highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally.

In 1909, this Court, in *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19, 48–50, held that the question whether a rate yields such a return as not to be confiscatory depends upon circumstances, locality and risk, and that no proper rate can be established for all cases; and that, under the circumstances of that case, 6 per cent. was a fair return on the value of the property employed in supplying gas to the City of New York, and that a rate yielding that return was not confiscatory. In that case the investment was held to be safe, returns certain and risk reduced almost to a minimum—as nearly a safe and secure investment as could be imagined in regard to any private manufacturing enterprise.

In 1912, in *Cedar Rapids Gas Light Co.* v. *Cedar Rapids,* 223 U. S. 655, 670, this Court declined to reverse the state court where the value of the plant considerably exceeded its cost, and the estimated return was over 6 per cent.

In 1915, in *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153, 172, this Court declined to reverse the United States District Court in refusing an injunction upon the conclusion reached that a return of 6 per cent. per annum upon the value would not be confiscatory.

In 1919, this Court in *Lincoln Gas Co.* v. *Lincoln,* 250 U. S. 256, 268, declined on the facts of that case to approve a finding that no rate yielding as much as 6 per

cent. on the invested capital could be regarded as confiscatory. Speaking for the Court, Mr. Justice Pitney said:

"It is a matter of common knowledge that, owing principally to the world war, the costs of labor and supplies of every kind have greatly advanced since the ordinance was adopted, and largely since this cause was last heard in the court below. And it is equally well known that annual returns upon capital and enterprise the world over have materially increased, so that what would have been a proper rate of return for capital invested in gas plants and similar public utilities a few years ago furnishes no safe criterion for the present or for the future."

In 1921, in *Brush Electric Co.* v. *Galveston,* the United States District Court held 8 per cent. a fair rate of return.[4]

In January, 1923, in *Minneapolis* v. *Rand,* the Circuit Court of Appeals of the Eighth Circuit (285 Fed. 818, 830) sustained, as against the attack of the city on the ground that it was excessive, 7½ per cent., found by a special master and approved by the District Court as a fair and reasonable return on the capital investment—the value of the property.

Investors take into account the result of past operations, especially in recent years, when determining the terms upon which they will invest in such an undertaking. Low, uncertain or irregular income makes for low prices for the securities of the utility and higher rates of interest to be demanded by investors. The fact that the company may not insist as a matter of constitutional right that past losses be made up by rates to be applied in the present and future tends to weaken credit, and the fact that the utility is protected against being compelled to serve for confiscatory rates tends to support it. In

---

[4] This case was affirmed by this Court, June 4, 1923, *ante,* 443.

this case the record shows that the rate of return has been low through a long period up to the time of the inquiry by the commission here involved. For example, the average rate of return on the total cost of the property from 1895 to 1915, inclusive, was less than 5 per cent.; from 1911 to 1915, inclusive, about 4.4 per cent., without allowance for depreciation. In 1919 the net operating income was approximately $24,700, leaving $15,500, approximately, or 3.4 per cent. on $460,000 fixed by the commission, after deducting 2 per cent. for depreciation. In 1920, the net operating income was approximately $25,465, leaving $16,265 for return, after allowing for depreciation. Under the facts and circumstances indicated by the record, we think that a rate of return of 6 per cent. upon the value of the property is substantially too low to constitute just compensation for the use of the property employed to render the service.

> *The judgment of the Supreme Court of Appeals of West Virginia is reversed.*

MR. JUSTICE BRANDEIS concurs in the judgment of reversal for the reasons stated by him in *Missouri ex rel. Southwestern Bell Telephone Co.* v. *Public Service Commission of Missouri, supra.*