## GRAFF v. TOWN OF SEWARD.

Third Division. Seward. October 3, 1925.

No. S-191.

1. **Electricity** ⊗⇒11—**Municipal Corporations—Power to Fix Electric Light Rates.**

The town of Seward, by Ordinance No. 78, fixed rates for the sale of electric lights and power by the plaintiff, who owns the only electric light and power plant in the town. Plaintiff brought suit to restrain the enforcement of the ordinance, because the rates fixed thereby were too low and confiscatory. *Held*, that the plaintiff was entitled to a fair profit on his investment, but that he is not entitled to a profit on unnecessary expenditures, nor on the amount invested in his private dwelling place, nor on a concrete garage constructed for his own use, nor on fuel used for heating the power plant building and plaintiff's living rooms, nor on unwise and uneconomic investments. *Held*, further, the basis of return should be the amount of a prudent investment, and not speculation in the future growth of the town.

2. **Electricity** ⊗⇒11—**Basis of Return on Investment.**

The owner and operator of a public utility is entitled to a fair return upon the money he·has judiciously invested for the public service, and which he is still using. He should not be charged with every loss caused, even by mistaken judgment, if his investment is one that prudent men might be expected to make; but the public should not be expected to pay returns upon investments for mere experiment, nor investments which are partly made for private use.

3. **Electricity** ⊗⇒11—**Courts—No Jurisdiction to Fix Rates on Electric Lights Furnished by Utility Company.**

The court has no power or jurisdiction to fix rates for electric lights or power to be furnished to the inhabitants of a town, or to the town itself, not even when the parties litigant consent to such action.

Donohoe & Dimond, of Valdez, for plaintiff.

L. V. Ray and A. E. Rucker, both of Seward, for defendant.

RITCHIE, District Judge. It is conceded by counsel in this case that the main issue is the reasonableness or otherwise of the rates for electric lighting and power fixed by Ordinance No. 78 of the town of Seward for the product of plaintiff's electrical plant, which is the sole electrical plant in the town of Seward, furnishing light and power to the inhabitants and

⊗⇒See same·topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to the town for street lighting. Incidental questions were argued to some extent in the trial, but they have no particular bearing upon the chief issue.

Prior to the adoption of Ordinance No. 78, plaintiff and his predecessor in business had furnished light and power almost exclusively on flat rates, and it is claimed by defendants, and testimony was given to show, that plaintiff has persistently refused, except in a few instances, to allow electric current to be measured by meters and paid for accordingly. Ordinance No. 78 specifically provided that plaintiff must furnish meters to customers whenever asked, and that the rate for lighting purposes should be 12½ cents per kilowatt, and a less rate for power. An important difference between plaintiff and the town is over street lighting. All street lights had always been upon flat rates, and a part of the street lighting system was composed of what the electricians describe as a system of multiple lights, a system which is probably not well understood by anybody except electricians. Plaintiff claimed that he could not install meters for the multiple street lights, except by changing the entire system at great expense.

Shortly before the date fixed for Ordinance No. 78 to become effective, to wit, September 2, 1924, plaintiff instituted a suit asking a permanent injunction to prevent the enforcement of Ordinance No. 78, alleging in his complaint that the rates fixed by said ordinance would be confiscatory of his property, and therefore an invasion of his constitutional rights. A temporary injunction was granted. About the same time the city city asked for a peremptory writ of mandamus from the court to compel acceptance by plaintiff of the ordinance rates and the supplying of electric current under the terms of the ordinance. This case was afterwards consolidated with plaintiff's case.

At a preliminary hearing in October, 1924, a stipulation was made between the parties, providing that until the final determination of the suit plaintiff should furnish electric current for lighting purposes at 15 cents a kilowatt, and 10 cents for power. It was also stipulated that it was desirable for those rates to be tested for a few months for such light as the result might throw upon the reasonableness of the ordinance rates.

The cause came on for trial in the latter part of May, 1925, and continued, after an adjournment, late in June. It was agreed throughout the trial by court and counsel that the court

had no power to fix rates; that it could only pass upon the reasonableness of the rates fixed by Ordinance No. 78. At the conclusion of the testimony and argument of counsel, the court announced its decision that plaintiff had failed to prove his case, that on the whole evidence it was not apparent that the rates would be confiscatory, but stated, that as that time was the season of the year when there is no darkness in Seward, and consumption of current for lighting is very small, it would probably be unfair to plaintiff, and cause him unnecessary loss, if he were compelled at that particular time to change his system of business and his rates to meet the requirements of the ordinance, and for that reason findings and judgment would not be signed until the last day of September, which would enable the new rates to go into effect on October 1st.

The evidence upon which the decision of the court is based is the following: Plaintiff claims an investment in his business of from $180,000 to $200,000, and asserted that he was entitled to a 10 per cent. return on that investment. Defendants answered, and it is plain, that a town with a population of 700 to 800 could not pay a profit of $20,000 a year for electric service. Three expert electricians testified in behalf of the defendants, one of them the manager of an electrical business in a neighboring town. All of these witnesses agreed that much of the expenditure made by the plaintiff upon his plant was wholly unnecessary to a proper conduct of the business; that some of his improvements were not a necessary part of the business of supplying electric current to the town of Seward.

With these conclusions I am obliged to agree. It is undisputed that plaintiff has an excellent plant and buildings, as he claims. His power house is a two-story cement building. The power plant is on the ground floor. The second floor is equipped for living rooms for plaintiff and his family, and is occupied by them. These living rooms are clearly unnecessary for the conduct of plaintiff's business, and are no part of the investment devoted to the public service. Plaintiff also has a cement garage, which he explained was built to house a truck with which he intended to do hauling necessary in his business. But the garage is large enough to house several automobiles. A small frame building would have been sufficient to shelter the truck. A great deal of space in the garage is occupied by plaintiff's Studebaker car, which is used by himself and family. Among

the items of expense for the last year is the sum of more than $1,000 for fuel which it was stated was coal used to heat the power plant building. It was testified by most of the electricians that it is unusual to have heat in power rooms in electrical plants. I am obliged to accept the view that it is unnecessary; that most of the consumption of fuel was for heating plaintiff's living rooms upstairs. So the item of fuel, or most of it, should be deducted from plaintiff's statement of the cost of operating his business.

Plaintiff's power for the generation of electricity by his hydroelectric system is water coming from a gulch between mountains on the upper side of town. At the head of this gulch, several miles above town, is a glacier and perpetual snow. In periods of very heavy rains, or extremely warm weather in summer, when ice and snow melt very rapidly, the stream running through the gulch overflows, and has several times carried out a part of plaintiff's pipe line. This has caused him a great deal of expense, as well as temporarily cutting off the supply of electric current to the town. In the late winter months the supply of water gets so low that plaintiff is often unable to generate sufficient power for the needs of the town. If the town grows very much, this water shortage in the late winter will make it impossible for plaintiff to supply the town adequately with current at that season. The supply of water in summer is ample for much more power than the town is likely to need for some years to come. Owing to the frequent difficulties with his water power, plaintiff two years ago went farther up the stream and installed a new intake, built of cement, at a cost of $22,000.

All the other electricians who testified in the case expressed the opinion that this cement intake was a bad investment. They were all of the opinion that his water power supply is uneconomic, and will always remain so, and that necessarily, with the growth of the town, his handicap in that respect will become constantly greater. They were of the opinion, and so am I, that he ought to seek another source of water power, one which at least is available, although it would undoubtedly cost a great deal of money to make use of it. I agree with the electricians who think that plaintiff might do very well indefinitely with his present water power, if he would install an auxiliary plant, with twin Diesel engines, for use in times of water shortage,

or other interference with water power generation. I am of the opinion, from all the evidence, that plaintiff has invested enough money in buildings and fixtures unnecessary for the public service to install such an auxiliary plant, the estimated cost of which is about $50,000. It might be somewhat more than that, and it might be less. Owing to the difficulties plaintiff has had for 20 years with his water power, he has been put to great expense at various times for repairs and replacements. A few years ago a heavy flood practically destroyed his pipe line, and the overflow of water ran through his power house, leaving a heavy deposit of sand and gravel there and inflicted other damage. This caused a heavy loss to plaintiff or the company, his predecessor, of which he was the head and manager, and this loss and other losses are charged by him in his capital investment.

· I see no advantage in attempting to figure all items of operating loss and unnecessary investments which I think should be deducted from plaintiff's estimate of his capital investment. After listening to the testimony of the other electrical experts who testified in the case, and considering it carefully, together with plaintiff's own estimate, I am satisfied that the part of plaintiff's investment which is useful for public service in the town of Seward is about half of the amount that he claims. I do not question that he expended the money as his figures show, but a great deal of it was unnecessary, and a great deal more of it I think the result of imprudent investment.

The law governing returns to public utilities is not fully settled, although some recent cases in the Supreme Court have brought considerable order out of chaos, particularly Georgia Power Co. v. Ry. Com., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144, and Bluefield v. Public Service Com., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176. The Supreme Court also in the main adhers to the rule laid down in Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819. It is true that there was dissent in the court in these late decisions. Personally I have strong inclination to favor the rule laid down by Mr. Justice Brandeis, that the basis of return should be the amount of prudent investment. Justice Brandeis v. Ames, criticized the rule in Smyth v. Ames, laid down by Justice Harlan.

I am unable to see much difference between the detailed statement of Justice Harlan of the factors which should enter into

the basis for rate fixing and the rule of prudent investment advocated by Justice Brandeis. It seems to me that they amount to the same thing, and that is that the owner and operator of a public utility is entitled to a fair return upon money that he has judiciously invested for the public service and which he is still using. He should not be charged with every loss caused even by mistaken judgment, if his investment is one that prudent men might be expected to make; but the public should not be expected to pay returns upon investments for mere experiment, nor investments which are partly made for private use.

In this case I am satisfied that a more careful consideration of the natural obstacles to be contended with, and the probable future of the town, would have entailed an investment of not more than half the amount that plaintiff has put into his business. Plaintiff testified that he had been building largely for the future; but, while this is commendable within reasonable limits, the present town of Seward should not be compelled to pay interest on investments made in the belief that within a short time the town will be several times as large. A certain amount of building for the future is business prudence, but beyond that it is mere speculation. The known history of Alaska towns, their sudden growth, and frequently almost immediate decadence, ought to suggest to any business man not to risk too much on the future.

Another fact must be taken into consideration by the court, and that is the ability of the town to pay. It has already been stated, and I think no one will dispute it, that the town of Seward cannot pay a rate much higher than Ordinance No. 78 fixes for electric current. There are towns in Alaska which have less than one-fifth the population they had a few years ago. If an expensive electric plant had been installed in one of these towns, when its population was at its maximum, it is plain that no such plant would be necessary now, and it would be unreasonable to expect the handful of people remaining to pay interest on an investment made for the service of five times the population. It is admitted that the town of Seward only a few years ago had a population nearly, if not quite, double the present number of inhabitants.

While it is undoubtedly true that the ordinance rates will not yield a return to plaintiff which will give him a large return on

his claimed investment, I am of the opinion that the rates cannot on any fair consideration of the whole testimony be regarded as confiscatory. I think, on the contrary, that they will yield some profit above the cost of operation, and that is shown by plaintiff's annual statement of income and operating cost for the past year, after deducting certain items which are not properly chargeable, and one of which, an item of $1,300 for back income tax, he admitted should not have been charged.

Because I believe plaintiff has wholly failed to prove that the rates will be confiscatory, I am obliged to find against him, and dismiss the case, without prejudice to another suit, if actual experience of at least a year shall show that I am mistaken in my present conclusion.

One other matter calls for comment. In the preliminary hearing a year ago, a perplexing factor was the multiple street lights already referred to. Plaintiff testified that he could not, without changing the system, put those multiple lights on a meter. After a brief discussion as to what should be done pending the suit, plaintiff stated that he could not afford to furnish those multiple lights for less than $2.16 a month. The court was of the opinion, as urged by counsel for defendants, that $1.25 a month would be sufficient; but it was stipulated between the parties in open court that the court might fix a temporary rate of $2.16 a month, plaintiff to give a bond to refund the excess at the termination of the action, if the counsel rates were finally allowed to prevail by the judgment of the court. Accordingly a written order was drawn, which I signed, directing plaintiff to furnish the multiple lights at $2.16, and the town to pay that rate. At that time it did not occur to me that the court was exceeding its jurisdiction, although I was of the opinion then, as I have been throughout and am to-day, that the court has no power to fix rates. I am satisfied that that order was error of law, although it was signed on stipulation of counsel. The stipulation, however, could not cure the error, for the well-known reason that consent never can confer jurisdiction. However, I do not think that any harm has resulted from that erroneous order.