K N ENERGY, INC., APPELLEE, V. CITIES OF BROKEN BOW ET AL., APPELLANTS.
K N ENERGY, INC., APPELLEE, V. CITIES OF COZAD ET AL., APPELLANTS.
K N ENERGY, INC., APPELLEE, V. CITIES OF ARAPAHOE ET AL., APPELLANTS.
K N ENERGY, INC., APPELLEE, V. CITIES OF ALBION ET AL., APPELLANTS.

505 N.W.2d 102

Filed August 27, 1993.    Nos. S-91-848, S-91-849, S-91-850, S-91-851.

Dale C. Crandall, of Clinch and Crandall, Michael L. Bacon, James D. Larson, Michael J. Shaughnessy, and, on brief, John Battershell for appellants.

M.J. Bruckner, of Bruckner, O'Gara, Keating, Hendry, Davis & Nedved, P.C., B.J. Becker, and Kathryn McCoy for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

SHANAHAN, J.

K N Energy, Inc. (K N), a retail supplier of natural gas for customers in several municipalities, filed an action in the district court for Lancaster County for an injunction to prevent numerous municipalities in eastern and central Nebraska from enforcing ordinances which set natural gas rates lower than the rates requested by K N pursuant to the Municipal Natural Gas Regulation Act, Neb. Rev. Stat. §§ 19-4601 to 19-4623 (Reissue 1987 & Supp. 1989). The district court found that the rates prescribed by the municipalities' ordinances were "arbitrary, unreasonable and confiscatory" and, consequently, resulted in a deprivation of K N's property without due process, a violation of the 14th Amendment to the U.S. Constitution. The district court then enjoined enforcement of the rate ordinances.

The Nebraska Court of Appeals held that K N failed to meet its burden of proving the cost of its service as a factor in determining an appropriate rate for K N, reversed the district court's judgment, and remanded the cause for a new trial. *K N Energy, Inc. v. Cities of Broken Bow et al.*, 1 NCA 2185 (1992). Pursuant to Neb. Rev. Stat. § 24-1107 (Cum. Supp. 1992), we granted K N's petition for further review of the decision of the Nebraska Court of Appeals.

## STANDARD OF REVIEW

"An injunction is a remedy available through an equity action." *Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 750, 472 N.W.2d 391, 395 (1991). See, also, *Burton v. Annett*, 215 Neb. 788, 341 N.W.2d 318 (1983).

> In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where credible evidence is in conflict on a material issue of fact, an appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

*Chambers-Dobson, Inc. v. Squier*, 238 Neb. at 750, 472 N.W.2d at 395. Accord, *In re Estate of Stephenson*, 243 Neb. 890, 503 N.W.2d 540 (1993); *Ehlers v. Perry*, 242 Neb. 208, 494 N.W.2d 325 (1993); *Gottsch v. Bank of Stapleton*, 235 Neb. 816, 458 N.W.2d 443 (1990); *American Sec. Servs. v. Vodra*, 222 Neb. 480, 385 N.W.2d 73 (1986). See, also, Neb. Rev. Stat. § 25-1925 (Cum. Supp. 1992) (appeal of an equity action; de novo review).

## FACTUAL BACKGROUND

On July 1, 1990, K N filed applications for rate increases in 147 municipalities in eastern and central Nebraska. The requested increases varied from area to area and ranged from 18.02 to 24.09 percent. K N prepared a cost-of-service study to justify its requested rate increases and filed the study with its applications to each municipality. In accordance with § 19-4607, the requested increases became effective on October 1, 1990, but were subject to a partial refund if the rates, as

finally determined, were less than the interim rates that had been placed into effect.

The municipalities hired the consulting firm of Dahlen, Berg & Co. (Dahlen), which prepared a "Municipal Report" containing an analysis of K N's cost-of-service study. Dahlen made various adjustments to K N's computations and recommended significantly lower rate increases that ranged between 5.02 and 10.7 percent. K N subsequently filed a "Rebuttal Report," disputing Dahlen's adjustments of the figures contained in K N's study. After area rate hearings held pursuant to § 19-4616(4), many municipalities passed ordinances that set natural gas rates for K N at, and sometimes below, the level recommended in the Dahlen report.

In January 1991, K N filed petitions in the district court to enjoin enforcement of the ordinances which set natural gas rates at or below the level recommended in the Dahlen report. K N alleged that the rates expressed in the various ordinances were arbitrary, unreasonable, and capricious and deprived K N of its property without due process of law, a violation of U.S. Const. amend. XIV; Neb. Const. art. I, § 3; and the Municipal Natural Gas Regulation Act.

At trial, when K N sought to introduce exhibits 1 to 8, which included transcripts of the various rate hearings, rate ordinances, K N's cost-of-service study, the Dahlen report, and K N's rebuttal report, the municipalities objected on the bases of foundation, relevance, and hearsay. The following exchange occurred between counsel:

Mr. Bruckner: Your Honor, maybe we can clear this up. What is your objection to foundation?

Mr. Larson: There is probably a million numbers in there, Mr. Bruckner. We can't stipulate to the - -

Mr. Bruckner: I'm not offering any of that for the truth of what is contained. I am offering it solely for the fact that it is what transpired at the hearings below. It is the evidence that was before the cities upon which they made their judgment. It is offered for that limited purpose. It is the beginning point of this lawsuit.

The court overruled the objections and received the exhibits.

The district court found that the rates adopted by the

municipalities were arbitrary, unreasonable, and confiscatory, and, consequently, the court enjoined enforcement of the rates in the ordinances passed by the municipalities.

On appeal to the Court of Appeals, the municipalities contended that because K N introduced the cost-of-service study for the limited purpose of showing what had occurred at the rate hearings and had not introduced any other evidence regarding the cost of service, K N had not met its burden of proving that the rates set by the municipalities were arbitrary, capricious, and confiscatory; hence, K N was not entitled to injunctive relief.

The Court of Appeals agreed with the municipalities, reversed the district court's judgment, and remanded the cause for a new trial.

## K N'S COST-OF-SERVICE STUDY

The Court of Appeals concluded that K N had failed to prove its case because K N's cost-of-service study was merged into the rate ordinances and that the study could not be introduced at trial because

> [t]he hearing in district court cannot be a review of the legislative record of the rate hearings. . . .
>
> The district court was in error in accepting the rate area hearing records into evidence for the limited purpose of showing what transpired at the rate area hearings. That evidence served no purpose in district court because the hearing records merged into the ordinances.

*K N Energy, Inc. v. Cities of Broken Bow et al.*, 1 NCA 2185, 2191-92 (1992).

In arriving at the foregoing conclusion, the Court of Appeals relied on *Williams v. County of Buffalo*, 181 Neb. 233, 147 N.W.2d 776 (1967), and *K N Energy, Inc. v. City of Scottsbluff*, 233 Neb. 644, 447 N.W.2d 227 (1989). In *Williams*, we held that a statute authorizing an appeal from a municipality's annexation of land violated the separation of powers provision in Neb. Const. art. I, § 2, because the statute delegated legislative power to the judiciary, that is, the power to evaluate reasons for an annexation. In *Williams*, this court said: "The passage of the ordinance presumes a finding that the conditions

and limitations contained in the delegating statute exist or have been complied with. The findings of the city council thereon are legislative and are in a sense merged in the ordinance upon its passage." 181 Neb. at 236, 147 N.W.2d at 780. In *City of Scottsbluff*, to interpret the Municipal Natural Gas Regulation Act, we relied on *Williams* and held that a gas utility may maintain an injunctive collateral attack to challenge the validity of rates set by ordinance.

In its decision for the present case, the Court of Appeals seized on the language in *Williams* regarding legislative findings merged into an ordinance. The previously mentioned excerpt from *Williams* is dicta, because *Williams* merely holds that legislative power for a municipal annexation cannot be delegated to the judiciary in a review of the reasons for the annexation. Moreover, the Court of Appeals' conclusion that a district court cannot consider evidence introduced at a rate hearing conducted by the municipality is a contradiction of *City of Scottsbluff*, wherein we stated that a utility "had the right to offer any evidence which was relevant to the issue and was not limited to the evidence received at the area rate hearings." 233 Neb. at 654, 447 N.W.2d at 234. Thus, K N may offer in the district court the same relevant evidence that was presented at the rate hearings and may offer additional evidence if necessary. In offering evidence, however, K N must comply with the Nebraska Evidence Rules. See Neb. Evid. R. 1101, Neb. Rev. Stat. § 27-1101 (Cum. Supp. 1992) (applicability of Nebraska Evidence Rules). Therefore, the Court of Appeals erroneously concluded that K N's cost-of-service study was inadmissible because the study was presented at the rate hearings conducted by the various municipalities.

EVIDENCE ADMITTED FOR A LIMITED PURPOSE

As previously mentioned, K N offered exhibits 1 to 8, which included the study, not "for the truth of what is contained" in the exhibits, but "solely" to show "what transpired at the hearings below." Apparently for that reason, the Court of Appeals concluded that K N had failed to meet its burden of proof, because K N's cost-of-service study was not offered as substantive evidence concerning rates.

If admissible evidence is offered or received for a limited purpose, the evidence is admitted only for the limited purpose specified. See, *Baer v. Schaap*, 171 Neb. 347, 106 N.W.2d 468 (1960); *Kucaba v. Kucaba*, 146 Neb. 116, 18 N.W.2d 645 (1945).

In the present case, K N's cost-of-service study was not offered for the truth of its contents concerning costs affecting rates, but was offered merely to show what had occurred during the municipal hearings held before K N filed its injunctive actions in the district court. Consequently, K N's study may not be considered as proof of K N's cost of service in reference to the question whether the rates are confiscatory.

However, the trial court received into evidence numerous other exhibits, including exhibits 11 to 22, which summarized the same financial data contained in K N's cost-of-service study, showed historical operating revenues and expenses, and projected returns under both the rates set by the municipalities and those proposed by K N. Thus, exhibits 11 to 22 contain evidence of K N's cost of service. Therefore, the Court of Appeals erred by concluding that K N failed to produce evidence of its cost of service.

## CONFISCATORY RATES

Although the Court of Appeals did not conduct a de novo review on the question of whether the municipalities set confiscatory rates in their ordinances, further review in this appeal requires a de novo review of K N's equity actions against the municipalities.

Section 19-4604 of the Municipal Natural Gas Regulation Act states in part: "Every rate made, demanded, or received by any utility shall be just and reasonable." Section 19-4612(1) of the act provides:

> The municipality, in the exercise of its power under the Municipal Natural Gas Regulation Act to determine just and reasonable rates for public utilities, shall give due consideration to the public need for adequate, efficient, and reasonable natural gas service and to the need of the utility for revenue sufficient to enable it to meet the cost of furnishing the service, including adequate provisions for depreciation of its utility property used and useful in

rendering service to the public, and to earn a fair and reasonable return upon the investment in such property.

Examining a state's regulatory power in setting rates for a utility, the U.S. Supreme Court stated in *Bluefield Co. v. Pub. Serv. Comm.*, 262 U.S. 679, 690, 43 S. Ct. 675, 67 L. Ed. 1176 (1923):

> Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment. This is so well settled by numerous decisions of this Court that citation of the cases is scarcely necessary.

The Court further stated:

> A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties . . . .

262 U.S. at 692.

Therefore, in setting rates that may be charged by a utility, a state cannot set rates which are unjust, unreasonable, and confiscatory and which, therefore, deprive the utility of property without the due process of law guaranteed by U.S. Const. amend. XIV and Neb. Const. art. I, § 3. See *Bluefield Co. v. Pub. Serv. Comm., supra*. Thus, the standard for a permissible gas rate under the Municipal Natural Gas Regulation Act is the constitutional standard required for due process. A government-established rate for a utility is confiscatory when the rate fails to produce a return on investment equal to the return realized on investments which have risks corresponding to those of the utility. See, *Power Comm'n v. Hope Gas Co.*, 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1944); *Los Angeles Gas Co. v. R.R. Comm'n.*, 289 U.S. 287, 53 S. Ct. 637, 77 L. Ed. 1180 (1933); *Bluefield Co. v. Pub. Serv. Comm., supra*.

In a collateral attack on a rate or rates set by an ordinance, the burden is on a utility to show that the municipally established rate is unjust, unreasonable, and confiscatory in violation of the constitutional right to due process. See *Kansas-Nebraska Nat. Gas Co., Inc. v. City of Sidney*, 186 Neb. 168, 181 N.W.2d 682 (1970). See, also, *Knoxville v. Water Co.*, 212 U.S. 1, 29 S. Ct. 148, 53 L. Ed. 371 (1909) (courts may enjoin enforcement of utility rates set by an ordinance when the rates are confiscatory and, therefore, invalid under the due process guarantee of the U.S. Constitution).

There is no formula for determining whether a rate is confiscatory; rather, a decision whether a rate is confiscatory is based on a consideration of all the relevant evidence. See *Los Angeles Gas Co. v. R.R. Comm'n., supra.*

Proceeding to a de novo review based on the record before us, but disregarding exhibits 1 to 8, which were not offered as substantive evidence, we now consider the ultimate question in this case: Did K N prove that the rates municipally established by ordinance were confiscatory?

Dr. R. Charles Moyer, a professor of finance, conducted a study for K N to determine the appropriate rate of return on K N's property used for supplying natural gas to the public. According to Dr. Moyer's study and his testimony at trial, K N's shareholders were entitled to a return of between 13.6 and 14.7 percent on their investment, so that the shareholders would receive a rate of return the same as that received on other investments in similar businesses.

To arrive at the rates proposed to the municipalities, K N used the 13.6-percent return expressed in Moyer's study and contends that anything less than a 13.6-percent return is confiscatory. Exhibits other than exhibits 1 to 8 show that the rates municipally established by ordinance would allow K N a return ranging from a high of 1.92 percent to a low of .5 percent and, in one rate area, even a loss of 2.64 percent.

Although the municipalities' expert witness testified that K N's rate of return should be 12.2 percent rather than 13.6 percent, the major dispute relates to some assumptions underlying K N's projected expenses and revenues as factors for the increased rates.

One of K N's assumptions involved the sales price for products extracted from natural gas before the gas is sold to K N's retail customers. When natural gas is taken from the ground, it contains numerous heavy hydrocarbons that have value independent of the natural gas. K N operates extraction plants at Scott City, Kansas, and Casper, Wyoming, where substances such as propane, butane, natural gasoline, and helium are extracted from the natural gas and sold on the open market. The revenues from the sales of these byproducts are subtracted from K N's cost of providing natural gas to its customers, reducing K N's rates charged in retail sales of natural gas. In projecting the amount of revenues from sales of these byproducts, K N estimated a sales price of $.32 per gallon, which was based on the actual average price obtained from sales during the year ending January 31, 1990. The actual average price during the 4 calendar years preceding 1990 was a per-gallon price of $.31 in 1986, $.28 in 1987, $.27 in 1988, and $.28 in 1989. The Dahlen report suggests that the proper estimated sales price for the byproducts is $.51 per gallon, which was the average sales price of K N's byproducts in September 1990, soon after Iraq's invasion of Kuwait and a worldwide increase in fuel prices based on an anticipated shortage of petroleum products. By March 1991, after the Gulf War, the average price obtained by K N for its byproducts had dropped to $.34 per gallon. Consequently, the Dahlen report's estimate of $.51 per gallon is an inordinately high estimate of prices obtainable in future sales of byproducts. K N's price estimate for future sales of gas byproducts appears more reasonable. Moreover, use of the municipalities' unrealistic price of $.51 per gallon for K N's byproducts results in an increase of nongas revenue and a corresponding decrease in rates based on gas sales. However, when the unrealistic price for byproducts is removed from the equation, the gas rates prescribed by the municipalities cause a reduction ranging from 3.7 to 4.99 percent in the rate of return of K N's equity.

Another disputed assumption is K N's estimated revenue from transporting natural gas through its pipelines for other natural gas suppliers. In 1985, the Federal Energy Regulatory Commission (FERC) issued a series of opinions which were

designed to stimulate competition through open access to natural gas pipelines. After obtaining FERC approval, pipeline companies can charge a fee for transporting gas for other gas suppliers. The FERC allows pipeline companies to engage in market-responsive pricing and has established maximum and minimum prices that can be charged for transportation services. Within the limits set by the FERC, pipeline companies can charge different prices for transporting natural gas, depending on what the supplier-customer is willing and able to pay. Suppliers that have no alternative transportation are charged the maximum rate, while suppliers that have alternative fuels or alternative means of transportation are charged a lower or discounted rate.

K N received permission from the FERC to become an open access transporter on May 1, 1989. Based on historical data, K N estimated receipts of $8.1 million per year for transportation services during the period when K N's proposed rates would be effective. The municipalities contend that K N must calculate its rates based on the maximum rate allowed by the FERC rather than the discounted rate for transportation services. Therefore, according to the municipalities, K N's transportation revenue should be adjusted upward by $6.8 million to $14.9 million. The municipalities' argument ignores economic reality. In sales of transportation services to customers with alternative sources of fuel or alternative means of getting natural gas to a desired location, K N must offer discounts. If K N did not offer discounts to its transportation customers, K N would supply fewer transportation services and, correspondingly, would experience a decrease in transportation revenue as a factor for eventual retail gas rates. Also, if the municipalities' increase of $6.8 million in transportation revenue is used with a corresponding and necessary decrease in gas rates, elimination of the $6.8 million in transportation revenue leaves rates that cause decreases ranging from 4.69 percent to 2.76 percent on K N's equity, depending on the particular locale of a municipality. Therefore, K N's assumptions regarding transportation revenue are more reasonable than are the municipalities' assumptions.

In addition to the two disputed assumptions which we have

discussed, the municipalities take issue with numerous additional assumptions underlying K N's request for increased rates. Nevertheless, even if the municipalities had adopted rates based only on the municipalities' erroneous assumptions regarding product revenue and transportation revenue, the combined effect of the two assumptions discussed is to decrease the return on K N's equity to a level below that which investors could earn from investments in other similar businesses. Therefore, the municipalities failed to pass rate ordinances that afforded a reasonable rate of return on the value of K N's property used for public service. For that reason, the rates set by the municipalities are confiscatory and deprive K N of its property without due process of law, a violation of U.S. Const. amend. XIV and Neb. Const. art. I, § 3.

## CONCLUSION

The Court of Appeals erred in its conclusion that K N failed to introduce evidence of its cost of service and, therefore, erred by reversing the district court's judgments and remanding these causes for a new trial. From our de novo review of the record, and considering the question of whether the rates municipally established by ordinance are confiscatory, we find that K N has met its burden of proving that the natural gas rates set by the municipalities in these proceedings are confiscatory. Thus, our conclusion is the same as that reached by the district court. Consequently, the Court of Appeals' judgment is reversed, and these causes are remanded to the Court of Appeals with the direction that the Court of Appeals shall reinstate the district court's judgments for K N, enjoining the enforcement of rates prescribed by the municipalities' ordinances involved in these proceedings.

REVERSED AND REMANDED WITH DIRECTION.