PEOPLES NATURAL GAS COMPANY,
DIVISION OF UTILICORP UNITED INC., APPELLEE, V.
THE CITIES OF BELLEVUE ET AL., APPELLANTS.

579 N.W. 2d 510

Filed June 5, 1998.   No. S-97-070.

Jeremiah D. Finnegan, of Finnegan, Conrad & Peterson, L.C., and Vincent M. Powers for appellants.

John E. Hubbard, Douglas J. Law, and Trenten P. Bausch, of Blackwell Sanders Matheny Weary & Lombardi, for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MCCORMACK, JJ.

CAPORALE, J.

We, on our own motion, removed this appeal of a utility rate fixed under the provisions of the Municipal Natural Gas Regulation Act, Neb. Rev. Stat. §§ 19-4601 through 19-4623 (Reissue 1997), from the Nebraska Court of Appeals to our docket under our authority to regulate the caseloads of the two courts. The defendant-appellant municipalities, the Cities of Bellevue, Blair, Elkhorn, Gretna, LaVista, Papillion, Plattsmouth, Ralston, Valley, and Waterloo, urge that the district court erred in enjoining the implementation of their ordinances preventing the plaintiff-appellee utility, Peoples Natural Gas Company, from employing a deferred method of accounting for certain environmental cleanup costs to be incurred in the future as confiscating Peoples' property without constitutional due process. The municipalities' assignment of error having merit, we reverse, and direct that the injunction be vacated and set aside.

Suits over utility rates fixed under the act are in equity, collaterally attacking the rate ordinances adopted by the municipalities in which the public utility has the burden to prove that the rates fixed were arbitrary, unreasonable, and confiscatory. See *K N Energy, Inc. v. City of Scottsbluff*, 233 Neb. 644, 447 N.W.2d 227 (1989).

Peoples, a division of UtiliCorp United Inc., a Delaware corporation, supplies natural gas and services to a number of cities,

towns, and villages in Nebraska and in other states. Its Nebraska business is divided into three separate rate areas; the defendant municipalities compose rate area 1.

In June 1995, Peoples filed a notice of intent to increase its natural gas rates. The municipalities hired a consulting firm to review the proposed rate increases. The consulting firm recommended substantially lower rate increases than Peoples had requested. Negotiations produced a partial settlement resulting in a compromise rate increase yielding $780,000 in additional annual revenue for Peoples. Under this partial so-called "black box" settlement, the parties agreed to the rate increase without agreeing to, or being bound by, a rate base amount, a percentage rate of return, or allowable operating expenses. As the parties were unable to reach agreement as to how to treat the future costs of cleaning up contaminated former gas-manufacturing plant sites, that issue was preserved for possible litigation.

When Peoples purchased Minnegasco's Nebraska property, it also acquired five former plant sites. The sites were used to manufacture gas between the late 1800's and the 1940's. The use of natural gas rendered the plants obsolete, and the manufacturing of gas was phased out. None of the sites were used for gas production after 1949, and perhaps none were in production after 1940. The manufacturing process produced significant quantities of toxic chemicals which permeated the sites. The plants were often razed, and natural gas facilities were constructed at the same sites. These sites are contaminated and will have to be cleaned up by Peoples, which had no contaminated gas plant sites in Nebraska prior to the purchase. The sites are currently being used by Peoples as locations for a truck garage, storage facility, office building, power station, and service center.

The condition of the sites is currently being evaluated, and cleanup costs are estimated to range from $500,000 to $15 million. The remediation process involves a certain amount of interaction with Nebraska's Department of Environmental Quality, so that Peoples' control over the expense and timeframe of the operation is limited. Peoples' expert estimated the cleanup would be accomplished in less than 5 years.

When cleanup of the sites became an issue in the 1980's, Minnegasco obtained rate ordinances in Nebraska which

allowed it to defer the environmental costs. Deferred accounting is the process of incurring a cost, deciding that the tests of probable recovery from the ratepayers through the regulatory process have been met, deferring the cost as a regulatory asset rather than charging it to current earnings, and then presenting those costs for recovery at the next rate-fixing proceeding.

At the time of Peoples' purchase, Minnegasco had accumulated approximately $475,000 as a regulatory asset. This "asset" was purchased by Peoples, along with the rest of Minnegasco's Nebraska property. Peoples has spent approximately $550,000 in cleanup costs through September 1996 and has been allowed to defer environmental cleanup costs in Nebraska rate area 3. Testimony indicated that the rate area 1 portion of the regulatory asset bought from Minnegasco (about 13 percent of the total) was included in the settlement agreement so that it was included in the compromise rate increase.

In the settlement agreement, all expenses for the 1994 test year were settled. It appears that Peoples has two choices with respect to the cleanup costs. It can charge the cleanup costs against income and attempt to pass the cost on to ratepayers with an immediate request for a corresponding rate increase, or it can assume the cleanup expenses and pass them on to its stockholders. Not surprisingly, Peoples wishes to treat the site cleanup costs under a deferred accounting method that would allow it to seek inclusion of all the reasonable costs of such cleanup in a future rate adjustment.

A government-established rate for a public utility is confiscatory when the rate fails to produce a return on investment equal to the return realized on investments which have risks corresponding to those of the utility. *K N Energy, Inc. v. Cities of Broken Bow et al.*, 244 Neb. 113, 505 N.W.2d 102 (1993). As noted in *Bluefield Co. v. Pub. Serv. Comm.*, 262 U.S. 679, 692-93, 43 S. Ct. 675, 67 L. Ed. 1176 (1923):

> A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncer-

tainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

The act provides in § 19-4604 that "[e]very rate made, demanded, or received by any utility shall be just and reasonable." Section 19-4612(1) of the act provides:

The municipality, in the exercise of its power under the [act] to determine just and reasonable rates for public utilities, shall give due consideration to the public need for adequate, efficient, and reasonable natural gas service and to the need of the utility for revenue sufficient to enable it to meet the cost of furnishing the service, including adequate provisions for depreciation of its utility property used and useful in rendering service to the public, and to earn a fair and reasonable return upon the investment in such property.

This case is unique because Peoples' rate of return is concealed within the settlement agreement. It is impossible, therefore, to determine exactly what Peoples' rate of return under the settlement will be. In an effort to fill that void, Peoples argues that as it requested a return of 13 percent and the municipalities' consultant suggested a return of 10.1 percent, the compromise rate of return must be somewhere in between that range. However, even if we accept that thesis, we are left with a record which does not establish the amount of a fair and reasonable rate of return.

For example, if the rate of return for a business in rate area 1 facing risks and uncertainties similar to Peoples is 9 percent, then the lack of deferred accounting could lower Peoples' rate of return by a full percentage point and still not render the rate confiscatory, as Peoples' rate of return would still be fair and reasonable.

In both *K N Energy, Inc. v. Cities of Broken Bow et al., supra*, and *K N Energy, Inc. v. City of Scottsbluff*, 233 Neb. 644, 447

N.W.2d 227 (1989), the public utility presented evidence of the rate of return of a comparable business, thus enabling us to determine whether the rates in question were confiscatory. The record in the instant case falls short of meeting Peoples' burden to establish that the rates fixed by the municipalities are arbitrary, unreasonable, and confiscatory.

Accordingly, as noted in the first paragraph hereof, we reverse the district court's decree and direct that the injunction be vacated and set aside.

REVERSED, AND INJUNCTION VACATED AND SET ASIDE.