NEW ENGLAND COALITION ON
NUCLEAR POLLUTION, et al.,
Petitioners,

v.

NUCLEAR REGULATORY COMMIS-
SION and The United States of
America, Respondents,

Carolina Power & Light Co., et
al., Intervenors.

No. 82–1581.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 23, 1983.

Decided Feb. 7, 1984.

William S. Jordan, III, Washington, D.C.,
with whom Diane Curran, Washington,
D.C., was on the brief, for petitioners.

Marjorie S. Nordlinger, Atty., N.R.C.,
Washington, D.C., with whom E. Leo Slag-
gie, and Kay L. Richman, Attys., Dept. of
Justice, Washington, D.C., were on the
brief, for respondents.

James B. Hamlin, Washington, D.C., with
whom Jay E. Silberg, Washington, D.C.,
was on the brief, for intervenor.

Before MIKVA, EDWARDS, and SCA-
LIA, Circuit Judges.

Opinion for the Court filed by Circuit
Judge SCALIA.

SCALIA, Circuit Judge:

The New England Coalition on Nuclear
Pollution (NECNP) and others—including
Kansans for Sensible Energy (Kansas being
a state where an application for a license to
operate a nuclear generating station is cur-
rently pending)—petition under 28 U.S.C.
§ 2342(4) (1976) for review of a rule of the
Nuclear Regulatory Commission. *Elimina-
tion of Review of Financial Qualifications
of Electric Utilities In Licensing Hearings
for Nuclear Power Plants,* 47 Fed.Reg. 13,-
750 (1982), 10 C.F.R. pts 2 and 50 (1983). In
the aspect here under challenge, the rule
amends the Commission's Rules of Practice
for Domestic Licensing Proceedings, 10
C.F.R. Part 2 (1982), and its substantive
requirements governing Domestic Licensing
of Production and Utilization Facilities, 10
C.F.R. Part 50 (1982), to eliminate the need
for applicants who are electric utilities to
establish their financial qualifications.[1] Pe-

---

1. The rule also requires power reactor licensees
to obtain on-site property damage insurance, or
to provide an equivalent form of protection
(*e.g.,* letter of credit, bond, or self-insurance),
from the time that the Commission first issues

an operating license for the reactor. This por-
tion of the rule is not challenged, is severable,
and is therefore not affected by the present
opinion. In our subsequent discussion, refer-

titioners contend (1) that the rule contravenes a requirement of financial qualifications review contained in the Atomic Energy Act, in particular §§ 103(b) and 182(a), 42 U.S.C. §§ 2133(b) and 2232(a) (1976); (2) that an interpretation of the Act which would grant the Commission authority to eliminate the requirement of financial qualification would produce an unconstitutional delegation of legislative power; (3) that the Commission's conclusions that no link exists between financial qualifications and safety, that current inspection efforts can assure safety, and that utilities can meet the costs of construction lack substantial evidence in the record; (4) that the Commission's failure to disclose the factual basis underlying its decision precluded effective comment; and finally (5) (implicit in petitioners' discussion of the last two points combined with their challenge to the rule as being arbitrary and capricious) that the rule is not supported by its accompanying statement of basis and purpose, as required by 5 U.S.C. § 553(c) (1982). We agree with the last, and accordingly remand the rule to the agency.

### I

Since 1968, the Commission's rules have required that applicants for licenses to construct or operate nuclear power plants provide the following financial information:

Information sufficient to demonstrate to the Commission the financial qualifications of the applicant to carry out, in accordance with the regulations in this chapter, the activities for which the permit or license is sought. If the application is for a construction permit, such information shall show that the applicant possesses the funds necessary to cover estimated construction costs and related fuel cycle costs or that the applicant has reasonable assurance of obtaining the necessary funds, or a combination of the two. If the application is for an operating license, such information shall show that the applicant possesses the funds necessary to cover estimated operating

costs or that the applicant has reasonable assurance of obtaining the necessary funds, or a combination of the two. With respect to any production or utilization facility of a type described in § 50.21(b) or § 50.22 [facilities for industrial or commercial purposes], or a testing facility, the following specific requirements shall apply:

If the application is for an operating license, such information shall show that the applicant possesses or has reasonable assurance of obtaining the funds necessary to cover the estimated costs of operation for the period of the license or for 5 years, whichever is greater, plus the estimated costs of permanently shutting the facility down and maintaining it in a safe condition.

10 C.F.R. § 50.33(f) (1982).

On August 18, 1981, the Commission published a notice of proposed rulemaking, announcing that it was contemplating amendment of the foregoing requirements and allied provisions, to eliminate them entirely with regard to electric utility applicants for construction permits; and either to eliminate them entirely or to limit their application to demonstration of financial ability to cover decommissioning costs, with regard to electric utility applicants for operating licenses. *Financial Qualifications; Domestic Licensing of Production and Utilization Facilities*, 46 Fed.Reg. 41,786 (1981). The proposal was said to be based upon two premises. First, that "regulated electric utilities (or those able to set their own rates) will be able to meet the costs for safe construction and operation of a nuclear production or utilization facility." *Id.* at 41,788. The Commission explained:

[S]uch utilities are usually regulated by state and/or federal economic regulatory agencies, and generally recover the costs of constructing generating facilities through the ratemaking process, subject to the oversight of such state and/or federal agencies. As a result, reasonable costs necessary to meet a utility's obligations (including NRC-imposed safety re-

ences to the rule pertain only to the challenged    portion.

quirements) are normally recovered through this ratemaking process. *See, e.g., FPC v. Hope Natural Gas Co.,* 320 U.S. 591 [64 S.Ct. 281, 88 L.Ed. 333] (1944); *Bluefield Water Works and Improvement Co. v. Public Service Commission of the State of West Virginia,* 269 [262] U.S. 679 [43 S.Ct. 675, 67 L.Ed. 1176] (1923). These landmark court decisions established the principle that public utility commissions are to establish a utility's rates such that all reasonable costs of serving the public may be recovered assuming prudent management of the utility.

*Id.* The second premise assertedly justifying the proposed rule was that there was no demonstrated relationship between financial qualifications and safety, direct inspection and enforcement being a more effective means of achieving the latter goal. In the Commission's words:

> [T]echnical reviews and inspection efforts are effective, direct methods of discovering deficiencies that could affect the public health and safety. While analysis of financial qualifications has been viewed in the past as possibly an additional method of determining an applicant's ability to satisfy safety requirements, experience has failed to show a clear relationship between the NRC's review of an applicant's financial qualifications and the applicant's ability to safely construct and operate a nuclear power plant.

*Id.* This latter point by itself, of course, could not explain the rule which the Commission was proposing—*i.e.,* a rule that "retain[s] ... current review under § 50.33(f) of applicants for any production or utilization facility license, if such applicants are not electric utilities." 46 Fed.Reg. at 41,-788. The Commission was not, evidently, asserting that in its view financial qualification requirements were utterly useless, but only that their questionable effectiveness, *combined with the peculiar characteristics of public utilities that assure solvency,*

arguably justify elimination of the requirements for that particular category of applicant. If sustained by the facts, that was a reasonable enough approach; even if a statutory mandate for review of financial qualifications exists (an issue we need not decide), it does not preclude the adoption of appropriate generalized criteria that would render some case-by-case evaluations unnecessary. *See Heckler v. Campbell,* —— U.S. ——, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983). *Cf. Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 535, 98 S.Ct. 1197, 1207, 55 L.Ed.2d 460 n. 13 (1978); *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

Opponents of the proposed rule attacked it on various grounds, but the most concerted attack was upon the premise that a public utility's regulated status assures adequate funding. That was controverted both in principle (for example, through reference to the refusal of some regulatory commissions to permit rate charges for construction work in progress ("CWIP"), J.A. at 150, and to the political pressures affecting rate-setting, J.A. at 137–39) and through the citation of specific instances in which needed funding was not forthcoming and financial difficulties were experienced (*e.g.,* J.A. at 143–45, 149, 150–51).

After receiving and considering comments, the Commission issued its final rule on March 31, 1982, adopting precisely the course it had proposed (without the alternative provision for retaining financial qualification requirements with regard to decommissioning costs[2]). In its statement of basis and purpose accompanying the rule, the Commission responded to the attacks upon its major premise of public utility solvency as follows:

> As to the first point raised by commenters opposing elimination of the financial qualifications review, the Commission does not find any reason to consider, in a vacuum, the general ability of utilities to

**2.** This option remains under consideration "in the context of [a] generic rulemaking [on decommissioning] now being conducted. Until that [is completed], the Commission has con-

cluded that it is premature to include any final decision on decommissioning in this final rule on financial qualifications." 47 Fed.Reg. 13,-751 (1982).

finance the construction of new generation facilities. Only when joined with the issue of adequate protection of the public health and safety does this issue become pertinent. As to this, the commenters' second point, the Commission in its *Seabrook* decision indicated its support for the substance of the proposed rule—elimination of the financial qualifications review because of the lack of any demonstrable link between public health and safety concerns and a utility's ability to make the requisite financial showing.

The actual financial situation analyzed in that case has not changed. There is no evidence that the safety of the public has been adversely affected by Public Service Company of New Hampshire's (PSCNH) difficulties in obtaining financing. It is true that to raise capital, PSCNH has sold part of its ownership in the Seabrook plant, but such action does not have any demonstrable link to any safety problems. Similarly, citing WPPSS' experience is not convincing, because WPPSS' response (and that of most other utilities encountering financial difficulties) has been to postpone or cancel their plants, actions clearly not inimical to public health and safety under the Atomic Energy Act. 47 Fed.Reg. at 13,751.

## II

In saying that it found it unnecessary "to consider, in a vacuum, the general ability of utilities to finance the construction of new generation facilities," the Commission chose to abandon, rather than defend, the first premise of its proposed rule. As we have noted, that premise was essential because it explained why public utilities could reasonably be treated differently, which was the whole object of the rule. In its place, the Commission has inserted the factual observation that *when* certain public utility licensees have encountered financial difficulties they have deferred or cancelled their construction plans rather than skimp on safety-related features. It is not an adequate substitute, because we fail to see any rational connection between that observation *and the licensees' character as public*

*utilities.* It may be possible to believe (though we do not pass upon the point), as the Commission evidently believed when it issued its proposed rule, that the very nature of government rate regulation—a compact whereby the utility surrenders its freedom to charge what the market will bear in exchange for the state's assurance of adequate profits—assures financial stability for public utilities. But the mere fact that some public utilities, when financially unstable, chose to abandon or defer proposed nuclear facilities instead of completing them inadequately, does not lead to the conclusion that all financially unstable public utilities, as opposed to other firms in that situation, will generally do so; nor do we see any a priori reason to believe that would be the case. In short, in refusing to consider "in a vacuum, the general ability of utilities to finance the construction of new generation facilities," the Commission has abandoned what seems to us the only rational basis enunciated for generally treating public utilities differently for the purpose at hand.

The final rule continues to rely upon the second premise set forth in the proposal, *i.e.,* that financial qualifications review has not been demonstrably successful in meeting safety concerns, and that direct inspection and enforcement are more effective. But it does not rely upon that premise *alone* —and indeed, such exclusive reliance would be irrational, since it would only support a rule eliminating financial qualifications review entirely, and not a rule exempting public utilities. Assuming that the Commission had the choice between finding financial qualifications review universally worthless and finding that electric utilities are generally so financially competent as to render financial qualifications review for them superfluous, "it cannot adopt one and apply the other. To do so is the essence of arbitrary and capricious action." *Squaw Transit Co. v. United States,* 574 F.2d 492, 496 (10th Cir.1978). While the petitioners may not have standing to complain of this rule's underinclusiveness, they assuredly do have standing to complain that the reason

which the Commission gave for its action—the lack of demonstrated effectiveness of financial qualifications review (its original second premise) *combined with* the observation (substituted for its original first premise of utility solvency) that financially distressed public utilities have cancelled or deferred their projects—makes no sense. For all we know, had the Commission been forced to rely upon the second premise alone it might have found that insufficient. We must affirm its action on the basis of the reasons assigned or not at all. *See SEC v. Chenery Corp.,* 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

In order to comply with the "procedure required by law," 5 U.S.C. § 706(2)(D), an agency rule must be accompanied by a statement of basis and purpose, 5 U.S.C. § 553(c), which demonstrates a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–246, 9 L.Ed.2d 207 (1962) (principle applied under corresponding APA provision governing adjudication); *Wawszkiewicz v. Department of Treasury,* 670 F.2d 296, 301 (D.C.Cir.1981) (per curiam). That fundamental requirement has not been met here. Since the other challenges raised by petitioner do not, even if valid, preclude all action that the Commission may take in connection with this rulemaking, we need not consider them here. "[W]here agency action must be set aside as invalid, but the agency is still legally free to pursue a valid course of action, a reviewing court will ordinarily remand to enable the agency to enter a new order after remedying the defects that vitiated the original action." *Williams v. Washington Metropolitan Area Transit Commission,* 415 F.2d 922, 939–40 (D.C.Cir. 1968) (en banc) (footnote omitted), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969); *City of Cleveland v. FPC,* 525 F.2d 845, 856 n. 89 (D.C.Cir.1976). Accordingly, we remand the rule to the Commission for further proceedings consistent with this opinion.

*Petition granted.*