**COALITION FOR THE ENVIRONMENT, ST. LOUIS REGION, Missourians for Safe Energy, and Crawdad Alliance, Petitioners,**

v.

**NUCLEAR REGULATORY COMMISSION and United States of America, Respondents,**

**Union Electric Company, Intervenor.**

**NEW ENGLAND COALITION ON NUCLEAR POLLUTION, et al., Petitioners,**

v.

**NUCLEAR REGULATORY COMMISSION and United States of America, Respondents,** ·

**Carolina Power & Light Company, Commonwealth Edison Company, et al., Intervenors.**

**Nos. 84–1313, 84–1514.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 11, 1985.

Decided July 11, 1986.

Lewis C. Green, St. Louis, Mo., with whom William S. Jordan, III, Washington, D.C., was on brief, for petitioners, Coalition for the Environment, St. Louis Region, et al., in No. 84–1313.

Eric R. Glitzenstein, with whom Alan B. Morrison and David C. Vladeck, Washington, D.C., were on brief, for petitioners, New England Coalition on Nuclear Pollution, et al., in No. 84–1514.

Carole F. Kagan, Attorney, Nuclear Regulatory Commission, with whom William H. Briggs, Jr., Solicitor and E. Leo Slaggie, Deputy Solicitor were on the brief for respondents, Nuclear Regulatory Com'n, et al., in Nos. 84–1313 and 84–1514. Sheldon L. Trubatch, Richard L. Black, Attorneys,

Nuclear Regulatory Com'n, Anne S. Almy, Claire L. McGuire and David C. Shilton, Attorneys, Dept. of Justice, Washington, D.C., also entered appearances for respondents, Nuclear Regulatory Com'n and U.S.

Jay E. Silberg, with whom James B. Hamlin and Helen Torelli, Washington, D.C., were on brief, for intervenors, Carolina Power & Light Co., et al., in No. 84–1514.

Thomas A. Baxter, Deborah B. Bauser and David R. Lewis were on brief, for intervenors, Union Electric Co. in No. 84–1313.

Philip P. Steptoe and Catherine T. Crowley, Chicago, Ill., were on brief, for intervenor, Com. Edison Co. in No. 84–1514. Frederick C. Williams also entered an appearance, for intervenor, Commonwealth Edison Co.

Before MIKVA, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

This case consolidates two petitions for review of decisions issued by the Nuclear Regulatory Commission ("NRC"). Applicants for permits to construct or licenses to operate nuclear power plants must be financially qualified to undertake the responsibilities sought. The Commission has eliminated case-by-case review of financial qualifications for utilities that seek operating licenses by adopting a rule making the generic determination that electric utilities that either are regulated public utilities or are authorized to set their own rates are financially qualified to operate nuclear power plants.

In No. 84–1514, petitioners New England Coalition on Nuclear Pollution, Kansans for Sensible Energy, Campaign for a Prosperous Georgia, and Seacoast Anti-Pollution League challenge this rule as inconsistent with statutory requirements and as arbitrary and capricious agency action. In No. 84–1313, petitioners Coalition for the Environment, Missourians for Safe Energy, and Crawdad Alliance challenge the decision by the Commission to issue an operating license to Union Electric Company without first considering petitioners' claim that the company is not financially qualified. We deny the petition in No. 84–1514, and dismiss the petition in No. 84–1313.

### BACKGROUND

The licensing process for commercial nuclear power plants has two stages. First, an applicant must obtain a permit to construct a plant. After construction has been completed, the applicant must obtain an operating license. At each stage, applicants are required to provide the Commission with the information necessary to demonstrate their fitness to meet Commission requirements.

Financial qualifications review originated in a regulation adopted by the Atomic Energy Commission (the predecessor to the NRC) in 1956, pursuant to its authority under the Atomic Energy Act to require from applicants for construction permits and operating licenses (both are known as "licenses," see 42 U.S.C. § 2235 (1982)) "such information as the Commission ... may determine to be necessary to decide such of the technical and financial qualifications of the applicant ... as the Commission may deem appropriate," 42 U.S.C. § 2232(a) (1982). The 1956 rule indicated, without further explanation, that license applicants must be "technically and financially qualified to engage in the proposed activities." 10 C.F.R. § 50.40(b) (Supp. 1956). The Commission in 1968 adopted more detailed financial qualifications regulations requiring each applicant to submit information "sufficient to demonstrate to the Commission" that it "possesses the funds necessary to cover estimated ... costs" or "has reasonable assurance of obtaining the necessary funds." 10 C.F.R. § 50.33(f) (1982). The information required included estimates of costs, identification of sources of funds, and financial statements. 10 C.F.R. Part 50 app. C (1982).

Following a 1978 proceeding before the Commission concerning the issuance to several New England utility companies of a construction permit for the Seabrook plant, the Commission issued a Memorandum and Order which included an extensive discussion of financial qualifications review. The Commission explained that "the 'reasonable assurance' concept embodied in the regulation is more more flexible than many of the Commission's safety criteria," and "does not normally contemplate refined analyses of an applicant's likely future ability to meet specific costs." *In re Public Service Co. of New Hampshire,* 7 N.R.C. 1, 9, 10 (1978). In addition to finding that the utilities seeking the Seabrook construction permit were financially qualified to receive it (a finding that was later affirmed on appeal, *New England Coalition on Nuclear Pollution v. NRC,* 582 F.2d 87 (1st Cir.1978)), the Commission noted that the case raised more general questions about what relationship, if any, exists between financial qualifications and safety, and in particular about how the status of an applicant as a public utility bears on that relationship. With these issues in mind, the Commission directed the staff to initiate a rulemaking proceeding "in which the factual, legal, and policy aspects of the financial qualifications issue may be reexamined." *In re Public Service Co. of New Hampshire,* 7 N.R.C. at 20.

The Commission staff conducted a study of financial qualifications review, which was summarized in a memorandum to the Commissioners dated April 27, 1979. Staff Memorandum, Addendum to Brief for Petitioners in No. 84–1514. The memorandum stated that prior to 1974, staff analysis of financial qualifications had been "generally cursory," and the issue had rarely been a contested one in licensing proceedings. The oil embargo of 1973 and the economic recession of 1974, the memorandum explained, led to financial difficulties for many utilities, and financial qualifications became "a frequently contested issue" in licensing proceedings. The memorandum went on to note that

[a]s the economy later recovered from the recession, the financial condition of most utilities also improved substantially. However, the NRC staff has maintained the precedents it set in response to the recession in terms of the increased scope of its review and in terms of the information required from applicants. In addition, applicants' financial qualifications continue to be a frequently contested issue in NRC licensing proceedings.

*Id.* at 3.[1] Upon reviewing the comments submitted by interested parties, the staff recommended amending the regulations to provide that

[a]n applicant (1) whose rates for service are determined by state and/or federal regulatory agencies (or are self-determined), and (2) whose most senior long-term debt is rated "A" or higher by both of the major securities rating services would be deemed financially qualified for a *construction permit.* An applicant that satisfies the first criterion (rate-setting) would be deemed financially qualified for an *operating license.* Applicants satisfying the specified criteria for either a construction permit or an operating license would not be subject to extensive financial qualifications reviews by the staff. Further inquiry and adjudication of an applicant's or a licensee's financial qualifications would be foreclosed after the Commission determines that compliance with the criteria has been demonstrated.

*Id.* at 10 (emphasis added).

On August 18, 1981, the Commission published a notice of proposed rulemaking in which it announced that it was contemplating amendments to its regulations that would eliminate case-by-case financial qualifications review for electric utilities applying for *either* construction permits *or* operating licenses (with the possible exception of retaining financial qualifications review with respect to decommissioning costs).

1. The Commission states in its brief, and the petitioners have not disputed, that no licensing board has ever found an electric utility financially unqualified. Brief for Respondents at 11.

Financial Qualifications; Domestic Licensing of Production and Utilization Facilities, 46 Fed.Reg. 41,786 (1981). This proposal went slightly further than that recommended by the Commission staff, for in addition to eliminating individualized financial qualifications review for electric utilities seeking operating licenses, the Commission was also considering eliminating financial qualifications review for electric utilities seeking construction permits regardless of the ratings given their bonds. After receiving and considering comment, the Commission adopted this proposal as its final rule. Elimination of Review of Financial Qualifications of Electric Utilities in Licensing Hearings for Nuclear Power Plants, 47 Fed.Reg. 13,750 (1982).

The New England Coalition on Nuclear Pollution and others filed a petition for review with this court. We granted the petition and remanded the rule for further proceedings. *New England Coalition on Nuclear Pollution v. NRC*, 727 F.2d 1127 (D.C.Cir.1984). In its notice of proposed rulemaking, the Commission had based its proposal on two premises: first, that regulated utilities will be able to meet the costs of safe construction and operation through the ratemaking process, and, second, that there was no demonstrated relationship between financial qualifications and safety, direct inspection and enforcement being the more effective monitor of safety. We noted that "[i]f sustained by the facts, that was a reasonable enough approach; even if a statutory mandate for review of financial qualifications exists (an issue we need not decide), it does not preclude the adoption of appropriate generalized criteria that would render some case-by-case evaluations unnecessary." *Id.* at 1129. In the statement of basis and purpose accompanying the rule, however, the Commission had abandoned its first premise, and relied instead on its second premise—that there was no demonstrated relationship between financial qualifications and safety—combined with the observation that in those cases in which utilities have encountered financial difficulties they have deferred or cancelled construction plans rather than cut back on

safety. That observation, we explained, did not rest on the licensees' character *as public utilities,* and the absence of a relationship between financial qualifications and safety, standing alone, could not support a rule eliminating financial qualifications review *only* for utilities. We concluded, therefore, that in adopting this rule the Commission had not shown a "rational connection between the facts found and the choice made," *id.* at 1131 (*quoting Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)), for the reasons it gave did not support a rule giving regulated utilities special treatment.

In response to our remand, the Commission published a new proposal and again invited public comment. Elimination of Review of Financial Qualifications of Electric Utilities in Operating License Reviews and Hearings for Nuclear Power Plants, 49 Fed.Reg. 13,044 (1984). The new amendments to the regulations that were being contemplated eliminated case-by-case financial qualifications review for electric utilities seeking operating licenses while retaining case-by-case examination for utilities (and all others) seeking construction permits. The Commission explained:

Commenters on the proposed rule had questioned whether rate commissions could be counted on to support plant construction. Recent cancellations and deferrals of nuclear plants under construction do in fact suggest that a utility's status as a regulated entity does not by itself always ensure that the necessary funds will be forthcoming to complete construction....

At the operating license review stage, however, the regulated status of electric utilities continues to provide a reliable basis for finding financial qualification. Here the focus is not on construction but on safe operation. The Commission believes that case-by-case review of financial qualifications for all electric utilities at the operating license stage is unnecessary for the following reason. Utilities are usually regulated through state

and/or federal economic agencies, and generally are allowed to recover all or a portion of the costs of constructing generating facilities and all of the costs of operation, subject to the oversight of such state and/or federal agencies. *See, e.g., FPC v. Hope Natural Gas Co.,* 320 U.S.C. 519 (1944); *Bluefield Water Works and Improvement Co. v. Public Service Commission of the State of West Virginia,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). These landmark court decisions established the principle that public utility commissions are to set a utility's rates such that all reasonable costs of serving the public may be recovered, assuming prudent management of the utility. Obviously, the funds needed to operate the plant in conformance with NRC safety regulations shoud [sic] be recoverable as reasonable costs of operation. The Commission believes it reasonable to conclude that, as a general rule, the rate regulation process assures for regulated electric utilities (or those able to set their own rates) the ability to meet the costs of a safe operation of a nuclear power facility.

*Id.* at 13,045.[2]

After receiving and reviewing submitted comments, the Commission adopted the proposed rule. It thus amended the regulations relating to applications for operating licenses along precisely the lines recommended in the 1979 staff report, while leaving intact (pending further study) the case-by-case financial qualifications review for all applicants seeking construction permits, contrary to the recommendation in that report.

*No. 84–1514*

■ Petitioners contend that the Commission's partial elimination of case-by-case review of financial qualifications is "inconsistent" with the requirements of the Atomic Energy Act, 42 U.S.C. § 2232(a) (1982). In their brief, petitioners provide the following excerpt from that statute:

.Each applicant [sic] for a license hereunder shall be in writing and shall specifically state such information as the Commission, by rule or regulation, may determine to be necessary to decide ... the technical and financial qualifications of the applicant....

Brief for Petitioners at 26 (quoting 42 U.S.C. § 2232(a) (1982)). Nothing in that excerpt suggests that the Commission may not employ, as it now seeks to do, generalized presumptions about the financial capabilities of certain types of business entities, such as electric utilities. In any event, petitioners' method of quoting statutory language is excessively selective. Without any omissions, the sentence from the Act cited by petitioners provides that:

Each application for a license hereunder shall be in writing and shall specifically state such information as the Commission, by rule or regulation, may determine to be necessary to decide *such of* the technical and financial qualifications of the applicant, *the character of the applicant, the citizenship of the applicant, or any other qualifications of the applicant as the Commission may deem appropriate for the license.*

42 U.S.C. § 2232(a) (1982). (The italicized portions are those left out by petitioners.) Petitioners' ellipses do more than eliminate surplusage and irrelevancies; they alter meaning. Quite plainly, the statute leaves to the expertise of the agency what sorts of determinations regarding financial capability are necessary.

To further support their statutory argument, petitioners cite two fragments of legislative history: statements by Congressman Cole, one at hearings and one on the House floor, that "of course, the Commission must evaluate the character and financial stability" of applicants, and that the Commission would issue a license to an applicant "who demonstrates that he has the financial capacity." [3] Even if we were

---

**2.** The case citations provided in this statement are incorrect. *Hope Natural Gas* is reported at

320 U.S. 591 (1944); *Bluefield* at 262 U.S. 679 (1923).

**3.** Petitioners' citation for the first statement is

inclined to view these statements by this one legislator as in some way authoritative, they would in no way preclude what the Commission has done—rely on generalized criteria in judging one category of applicants financially qualified.

■ Finally, petitioners suggest that the adoption by the Atomic Energy Commission of regulations requiring individualized demonstrations of financial qualifications two years after passage of the Act constituted a contemporaneous construction of the statute by the implementing agency, and hence is entitled to great weight in our interpretation of the Commission's statutory responsibilities. The short and sufficient answer is that those regulations were not a *construction* of the statute, but an exercise of discretionary authority *under* the statute, and they were not immune from later revision.

■ We therefore conclude, in agreement with the United States Court of Appeals for the First Circuit, that "[t]he Act gives the NRC complete discretion to decide what financial qualifications are appropriate." *New England Coalition on Nuclear Pollution v. NRC,* 582 F.2d 87, 93 (1st Cir.1978). Petitioners' challenge to the

new Commission rule as inconsistent with the Act is without foundation.[4]

■ We turn, therefore, to petitioners' second set of claims—that the adoption of this rule constituted arbitrary and capricious agency action and consequently was invalid.[5] Petitioners maintain (1) that the distinction made by the rule between applications for construction permits and applications for operating licenses is irrational; (2) that the rationale for the rule—regulated utilities will generally be able to recover their costs through the ratemaking process—is not supported by the record; and (3) that the Commission failed to consider the alternative of retaining case-by-case review and making it more stringent. These contentions are insubstantial.

■ Petitioners argue that eliminating individualized financial qualifications review of electric utilities at the operating license stage while retaining such review at the construction permit stage is irrational, because the same considerations ought to apply to each type of application. This ignores the material differences between the inquiry made of an applicant for a construction permit and the inquiry made of an applicant for an operating license, and between the methods by which con-

Hearings Before the Joint Committee on Atomic Energy on S. 3323 and H.R. 8862, To Amend the Atomic Energy Act of 1946, 83rd Cong., 2d Sess., Part II at 644–45 (1954), *reprinted in II Legislative History of the Atomic Energy Act of 1954,* 1629, 2282–2283 (1955). Their citation for the second statement is 100 Cong.Rec. 11023 (July 23, 1954), *reprinted in III Legislative History of the Atomic Energy Act of 1954, supra,* at 2875. The first statement was incorrectly quoted, and the second does not appear on the page of the Congressional Record cited. Perhaps the quotations offered appear elsewhere.

**4.** Petitioners also cite 42 U.S.C. § 2133(b) (1982), which provides that the Commission shall issue licenses to applicants "who are equipped to observe ... such safety standards ... as the Commission may by rule establish." This general language, particularly when read in conjunction with § 2232(a), does not impose any obligation on the Commission to conduct a case-by-case evaluation of financial qualifications.

**5.** While petitioners agree that "arbitrary and capricious" is the appropriate standard of re-

view, they suggest that the Commission's action was a rescission of a longstanding rule and that therefore our review ought to be "strict" and the Commission "must overcome a heavy presumption" that its prior regulations best fulfill the statutory mandate. Brief for Petitioners at 19, 23. The suggestion is wrong. Even if the Commission's action is properly characterized as a rescission, which is open to question, rescission of a rule is subject to the same standard of review as promulgation: The agency action is set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 2865, 77 L.Ed.2d 443 (1983). This standard is not traditionally described as "strict," and, far from the Commission being required to overcome a "heavy presumption," the burden of proof rests with petitioners. *See San Luis Obispo Mothers for Peace v. NRC,* 789 F.2d 26, 37 (D.C.Cir.1986) (en banc).

struction and operation are financed. An applicant for a construction permit must show a reasonable assurance of obtaining the funds necessary to meet construction costs; an applicant for an operating license must show a reasonable assurance of obtaining the funds necessary to meet operating costs. Construction is financed through the sale of bonds and other securities. The costs of construction are recovered through ratemaking, but while utilities are sometimes permitted to recover expenses for construction work in progress, they are often not permitted to recover costs until the plant is in operation. When construction of a plant is cancelled or deferred before it is completed, public utility commissions frequently will refuse to allow inclusion of the costs in the utility's rate base. In the notice of proposed rulemaking, the Commission observed that recent cancellations and deferrals of plants under construction "suggest that a utility's status as a regulated entity does not by itself always ensure that the necessary funds will be forthcoming to complete construction." 49 Fed.Reg. 13,045 (1984). The apparently enhanced possibility of cancellation may make the bonds less marketable. Once a facility is operating, in contrast, rate-base treatment can generally be relied upon, and the Commission noted no comparable evidence of cancellation of facilities in the midst of operating due to financial difficulties. The Commission left financial qualifications review for construction permits unchanged because the recent cancellations of plants under construction suggested that the issue of eliminating individualized review at that stage required "further study." *Id.* It was certainly not irrational for the Commission to decide that eliminating case-by-case financial qualifications review at the construction permit stage raised questions that eliminating such review at the operating license stage did not, and hence to defer the former, but not the latter, pending further consideration.

■ Petitioners next maintain that the Commission's conclusion that regulated utilities as a class are financially qualified

to operate nuclear plants is unsupported. They point out that there is no guarantee that utilities will request the necessary funds, no guarantee that those that request the funds will receive them, and no guarantee that those that receive the necessary funds will actually spend those funds on safety. However, financial qualifications review, even when case-by-case, never required absolute certainty, only a showing that there was "reasonable assurance" of financing the costs of operation. The Commission has determined that the ratemaking process provides that reasonable assurance, and that determination is not rendered infirm simply because speculative conditions can be posited under which the funds would not all be available, received, and properly spent. The Commission noted in promulgating this rule that it retained the authority to require additional information in individual cases when the presumption of financial qualification seemed unreliable because, for example, "a threshold showing is made that, in a particular case, the local public utility commission will not allow the total cost of operating the facility to be recovered through rates." 49 Fed.Reg. 35,751 (1984).

The counterintuitive assertion that utilities may not request rate increases to which they would be entitled rests primarily on the fact that public utilities do not include *specific* cost allowances for safety requirements in their filings. This is supported by a poll that was conducted by the National Association of Regulatory Utility Commissioners ("NARUC") of its members, a study of which was placed in the rulemaking record. Staff Analysis of NARUC Study, Joint Appendix ("J.A.") at 15–40. This study went on to indicate, however, that the state utility commissions regarded safety costs as part of the overall revenue requirement and that they are thus factored into the rates. Petitioners' reading of this study is no more convincing than their reading of the Atomic Energy Act.

There is ample evidence in the record to support the Commission's rejection of the

claim that utilities may not receive the funds they request to cover operating costs. Members of the Commission staff conducted visits and interviews with officials of various state and federal regulatory commissions to determine their rate-setting practices. They reported that:

> The [public utility commissions] visited stated without exception that the costs of safely operating and decommissioning nuclear power plants are allowed to be recovered through rates as long as the utility can show that the claimed costs are legitimate and that expenditures to meet such costs are prudent.

Memorandum of July 18, 1984, J.A. at 291. The Commission adequately responded to commenters raising this concern when it adopted the rule. It noted that it was "not uncommon" for public utility commissions to disallow some requested cost items, but that "NRC conversations with ratemaking bodies as well as the results of the NARUC questionnaire confirm that it is standard practice among ratemaking bodies to factor in the amount of disallowances to ensure that utilities receive enough rate relief when a plant goes into operation to recover all reasonable costs of safe operation." 49 Fed.Reg. 35,749 (1984). There does exist a regulatory policy against allowing recovery of costs incurred as a result of imprudent management. Such problems, however, can be addressed through other phases of the licensing process, such as the review of "management integrity." The same can be said of the utility which has funding available but declines to request it.

In similar fashion, the utility that has the necessary funds but refuses to spend them on safety presents an issue of management integrity, not financial qualifications. Individualized financial qualifications review never has included an examination of how the available funding actually is spent. The fact that utilities might choose to spend the money received for safety on something else is therefore irrelevant to the question whether the Commission properly determined that electric utilities have reasonable assurance of receiving the necessary financing to operate a nuclear power plant.

■ This brings us to petitioners' final argument—that the Commission failed to consider alternatives to its proposed rule. The specific "alternative" on which petitioners focus is that of intensifying financial qualifications review by not only retaining case-by-case evaluation but also incorporating into that evaluation an ongoing examination of how the utility actually spends the funding it receives. We have already answered this argument. Petitioners are free to suggest to the Commission that their proposal be adopted as a rule, but they cannot claim that the Commission's decision that electric utilities as a group meet the requirements imposed by financial qualifications review is invalid because the Commission failed to consider the altogether separate question of whether financial qualifications review ought to be extensively restructured and made more exacting.

For the foregoing reasons, we find the final rule adopted by the Commission adequately justified and supported, and the petition for review is therefore denied.

### No. 84–1313

The petitioners in No. 84–1313 seek review of Commission decisions concerning the issuance of a license to Union Electric Company, a public utility, to operate a nuclear power plant in Callaway County, Missouri. Specifically, they challenge the decision to grant the license without first considering the issue of financial qualifications, the denial of petitioners' Motion for Leave to File a Supplemental Contention on financial qualifications, and the denial of petitioners' motion to stay the granting of the license pending determination of financial qualifications.

In 1974, Union Electric applied for and was granted a construction permit for the Callaway plant. Its financial qualifications were contested at that hearing, and the company was found to be financially qualified. In 1980, Union Electric applied for an operating license. The petitioners before us intervened in those proceedings in oppo-

sition to Union Electric, but did not contest, as they could have, the company's financial qualifications. On those issues that were contested, the Licensing Board and the Appeals Board found in favor of Union Electric. On March 12, 1984, the Commission decided not to review the Appeal Board's decision, which therefore became final agency action.

On March 31, 1982, nearly four months after the close of the evidentiary hearing, the Commission issued its first attempted revision of financial qualifications regulations. On February 7, 1984, this court remanded that rule. *New England Coalition on Nuclear Pollution v. NRC*, 727 F.2d 1127 (D.C.Cir.1984). Our disposition contained no clear statement whether the remand was intended to vacate the rule or merely to remand it for further consideration by the Commission. On April 2, 1984, the Commission proposed the rule that, after adoption, became the subject of the petition for review in No. 84–1514. In June, the Commission announced that in the interim, until its new rule was adopted, the 1982 rule eliminating case-by-case financial qualifications for electric utilities would remain in effect. Financial Qualifications Statement of Policy, 49 Fed.Reg. 24,111 (1984). Because of the decision to retain the remanded rule temporarily, petitioners, who in April of 1984 sought for the first time to raise financial qualification issues, were unable to do so. Five days after the mandate in *New England Coalition* issued from this court, petitioners filed a Motion for Leave to File a Supplemental Contention on financial qualifications. While they had not previously sought to challenge the company's financial qualifications when they had had the opportunity to do so, they claimed that new facts had arisen which induced them to mount a new challenge on financial qualifications. They correctly noted that such a challenge had been foreclosed since the adoption of the first rule in 1982.

The Commission issued the Callaway license on June 11, 1984. Two days later, petitioners filed a motion to have that license set aside or, in the alternative, to stay its effectiveness pending resolution of the issue of financial qualifications. On July 6, 1984, the Commission denied the petitioners' motions, in part on the basis of the interim rule.

Petitioners argue that this action was illegal. Although our previous decision did not expressly vacate the 1982 rule, petitioners claim that once we declared the adoption of the rule irrational, the Commission was precluded from applying it, even on an interim basis. We need not reach the merits of this claim, which the imprecision of our remand sparked. We have now affirmed the Commission's new rule, which eliminates case-by-case financial qualifications review for regulated utilities (like Union Electric) applying for operating licenses. A remand to the Commission so that it could apply this rule and again deny petitioners' motions would be pointless.

Petitioners appear to concede that their financial qualifications challenge could not be aired on remand, Reply Brief at 13, but urge us to return the case nonetheless. They argue that a remand would have consequences for the awarding of costs, and additionally that the holding they seek would serve the purpose of indicating that the court has not "condoned" the Commission's action. *Id.* at 14. We decline to reprimand the Commission for its rational interpretation of a remand that was susceptible of more than one construction. Nor will we declare a dead controversy live simply for the sake of costs. The petition is dismissed.

Petition in No. 84–1514 *denied.*

Petition in No. 84–1313 *dismissed.*